## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### NEW HAVEN DIVISION
==================================

**IN RE:**

**CHARLES HARDING BYRD,**
**Debtor\***

**NUTMEG FINANCIAL HOLDINGS,**
**LLC**
**Movant**

**ROBERTA NAPOLITANO**
**, Trustee**

**CASE NO. 18-30218 (JAM)**

**CHAPTER 13**

**FEBRUARY 14, 2018**

## MOTION FOR RELIEF FROM AUTOMATIC STAY- WITH PREJUDICE ( REAL PROPERTY)

**NUTMEG FINANCIAL HOLDINGS, LLC** (the "Movant" or "Creditor"), by its undersigned attorney, Alana T. DeChello, hereby moves for the court to deny **CHARLES HARDING BYRD AKA CHARLES HARDING BYRD III,** (the "Debtor")'s Motion for Implementing the Automatic Stay effective as of February 12, 2018, due to the Debtor's non-compliance with the Contested Matter Procedures, as defined by Federal Rule of Bankruptcy Procedure 9014 and effective as of January 22, 2018. The Debtor's failure to comply with the Contested Matter Procedure shall prevent the automatic stay from taking effect until the debtor is in compliance with the guidelines set forth in Federal Rules of Bankruptcy Procedure 2002(a) and 9014. As a result, the Movant request for this court to determine that the Automatic Stay is not in effective and the Debtor has failed to redeem the property by the Debtor's scheduled Law Day, which was February 13, 2018.

In the event, the Debtor's Motion to Implement the Automatic Stay is granted, then the Movant moves for this Court pursuant to 11 U.S.C. §362, to deny the Debtor's petition for relief from the automatic stay with prejudice as to the Movant, in order to permit the Movant to exercise its state law rights for possession of certain real property known as **78 HULL STREET, ANSONIA, CT 06401** owned by the Debtor.

In further support of its motion, the Movant respectfully states:

1

## NATURE OF PROCEEDING

1. This motion initiates a contested matter pursuant to Federal Rules of Bankruptcy Procedure 9014 and a core proceeding pursuant to 28 U.S.C §157(b)(2)(A) and 157(b)(2)(G). This Court has jurisdiction over the subject matter of this contested matter pursuant to 28 U.S.C. §1334(b) and 157(a) et seq.

## BACKGROUND FACTS

2. On February 12, 2018, the Debtor, **CHARLES HARDING BYRD**, (the "Debtor") filed a voluntary petition for relief under Chapter 13, U.S.C. in the United States Bankruptcy Court, District of Connecticut (New Haven Division) bearing case number (18-30218), however failed to comply with the Contested Matter Procedures, as defined by Federal Rule of Bankruptcy Procedure 9014 and effective as of January 22, 2018.

3. As of the date of filing, the Debtor owned the following real property known as **78 HULL STREET, ANSONIA, CT 06401,** (hereinafter referred to as the "Property").

4. The Debtor executed a Promissory Note payable to the order of Naugatuck Savings Bank (the "Original Lender") in the original principal amount of $275,000.00, payable with interest thereon, dated May 12, 2003 and recorded May 13, 2003, in Volume 381 at Page 561 of the Ansonia Land Records, (the "First Note"), annexed hereto and made a part of as **Exhibit A**. The Movant is an entity that is entitled to enforce the Note and Mortgage as defined herein.

5. Pursuant to that certain Open-End Mortgage Deed (the "Mortgage"), dated May 12, 2003, and recorded May 13, 2003, in Volume 381 at Page 545 of the Ansonia Land Records, all obligations of the Debtor under and with respect the Note and the Mortgage are secured by the Property. Said Mortgage is attached hereto and made a part of as **Exhibit B**.

6. The Original Lender subsequently changed its legal name from Naugatuck Savings Bank to Ion Bank.

7. On December 12, 2003, the Debtor executed a Home Equity Line of Credit Note and Agreement, payable to the Original Lender in the original principal amount of $25,000.00, with interest thereon (the "Second Note"), attached hereto and made a part of as **Exhibit C**.

2

8. To secure the Second Note, by an Open-End Mortgage Adjustable Home Equity Line of Credit Account, dated December 12, 2003, and recorded on December 17, 2003, in Volume 395 at Page 640 of the Ansonia Land Records (the "Second Mortgage), the Debtor mortgaged the Property. A copy of the Second Mortgage is attached hereto and made a part of as **Exhibit D.**

9. The First Note, Mortgage, the Second Note and the Second Mortgage are currently held by Nutmeg Financial Holdings, LLC (the "Creditor" or "Movant"), by virtue of an Assignment of Mortgage Loan dated March 22, 2013, and recorded on May 15, 2013, in Volume 515 at Page 884 of the Ansonia Land Records, annexed hereto and made a part of as **Exhibit E.**

10. The Movant is the Noteholder and has standing to proceed in this case by virtue of the facts that said entity, directly or through an agent, has possession of the Notes. The Notes are made payable directly to the Movant as the Noteholder or has been duly endorsed.

11. On July 15, 2013, a Summons and Complaint were filed in an action commenced by the Original Lender against the Debtor and other certain defendants in the Superior Court, State of Connecticut, Ansonia-Milford Division, Docket No.: AAN-CV09-5031739-S (the "State Court Action") seeking, among other things, foreclosure of the First Note and Mortgage against the Property.

12. The Second Note and the Second Mortgage were due and payable in full by October 17, 2013 (the "Maturity Date").

13. On July 7, 2014, a Judgment of Foreclosure by Sale was entered in the State Court Action, (the "First Judgment"), which the Court set the sale date for October 25, 2014, a copy of the order is attached hereto and made a part of as **Exhibit F.**

14. On October 6, 2014, the Movant's filed a motion to reopened the First Judgment and reentered a Judgment of Foreclosure by Sale was entered by the Court (Moran, J.) on October 20, 2014, and set a sale date of January 10, 2015, a copy of the order is attached hereto and made a part of as **Exhibit G.**

15. The Sale was stayed by the Debtor's filing of Chapter 13 Bankruptcy on January 9, 2015, bearing Case No.: 15-30036-jam, (the "First Bankruptcy"), a copy is attached hereto and made a part of as **Exhibit H**, which was dismissed for "Other Reasons" on November 10, 2015, (the "First Dismissal").

3

16. On March 7, 2016, the Court reopened the Judgment in the State Court Action and reentered a Judgment of Strict Foreclosure, (the "Third Judgment"), with a law day set for the Debtor of April 4, 2016, a copy of the order is attached hereto and made a part of as **Exhibit I.**

17. On April 1, 2016, the State Action was stayed again by the Debtor's filing of Chapter 13 Bankruptcy bearing Case No. Case: 16-30500, (the "Second Bankruptcy"), attached hereto and made a part of as **Exhibit J**.

18. On March 8, 2017, the Court (Nevins, J.) granted the Movant's motion for Relief from Stay after a notice and hearing in compliance with the Court's Contested Matter Procedure, to permit the Movant and/or their successors and assigns to exercise their rights, if any, with respect to the Property, in accordance with non-applicable non-bankruptcy law, attached hereto and made a part of as **Exhibit K.**

19. After paying the requisite fee to open the Judgment in the State Action, on March 24, 2017, the Court (Moran, J.), granted the Movant's motion to reopened the Judgment and reentered a Judgment of Foreclosure by Strict Foreclosure and found the Creditor's claim relating to the First Mortgage of the Property to be $300,944.00, as of April, 10, 2017, excluding attorney's fees and costs, and set a law day for May 22, 2017, (the "Third Judgment"), attached hereto and made a part of as **Exhibit L.**

20. On May 19, 2017, one day before the law day, the Debtor filed a Claim For Statutory Stay by Reason of Chapter 13 Bankruptcy filing bearing Case No: 17-30748, (the "Third Bankruptcy") attached hereto and made a part of as **Exhibit M.**

21. On November 2, 2017, the Court (Nevins, J.) after notice and a hearing, granted the Trustee's Motion to Dismiss Chapter 13 Case, without prejudice, a copy of the Order is attached hereto and made a part of as **Exhibit N.**

22. The Movant filed in the State Action to Open the Judgment after paying the requisite fee, the Court (Moran, J.) granted the Movant's motion to open and Re-Entered Judgmet, and found the debt to be $310,517.02, as of December 31, 2017, excluding costs, the updated fair market value of the property to be $290,000.00, and the law day was set for the Debtor for Tuesday, **February 13, 2018**, a copy of the Order is attached hereto and made a part of as **Exhibit O**

4

23. On February 12, 2018, one day before the law day, the Debtor filed a Claim For Statutory Stay by Reason of Chapter 13 Bankruptcy filing bearing this Case No: 18-30218, (the "Fourth Bankruptcy").

24. On February 13, 2018, the Court issued a Deficiency Notice Regarding the Contested Matter Procedure that the Debtor's attorney failed to comply with this Court's Contested Matter Procedure and as a result the Automatic Stay should not take effect until the deficiency is cured.

## **RELIEF REQUESTED**

25. For the reasons hereinafter set forth, the Movant seeks an order from this Court pursuant to 11 U.S.C. §§362(d)(1):

(a) Denying the Debtor's Emergency motion to Implement the Automatic Stay as of February 12, 2018;

(b) An Order granting relief from the automatic stay with prejudice for cause and other grounds delineated herein in order for the Movant to take possession of the Property in the State Court Action, for failing to redeem the Property by the assigned law day;

(c) An Order granting the Movant's motion because the Movant's interest in the Property is not adequately protected and the Movant's interest in the collateral is not protected by equity cushion;

(d) An Order granting the Movant relief because the Debtor's continue to delay the State Court Action has significantly hindered the Movant's interest and rights to the Property.

## **GROUNDS FOR RELIEF**

### *A. STATUES AND RULES*

26. Pursuant to 11 U.S.C. §362(a), upon commencement of the Bankruptcy Case, the Movant was stayed from taking or continuing any action against the Debtor to collect the amount due to it or to enforce the mortgage liens on the Property.

27. Pursuant to U.S.C § 362(d)(1), on request of a party in interest, and after notice and hearing, the Court shall grant relief from the automatic stay, for cause, including lack of adequate protection of its interest in the subject Property.

5

28. Pursuant to 11 U.S.C §102(3), the term "including" as utilized in 11 U.S.C. §362(d)(1) is not limiting.

29. Pursuant to 11 U.S.C. §362(d)(2), on a request of a party in interest and after notice and a hearing, the Court shall grant relief from automatic stay with respect to an act against property under §362(a) if:

    (A).    The Debtor does not have an equity interest in such property; and

    (B).    Such property is not necessary for an effective reorganization.

**B. *SPECIFIC GROUNDS FOR RELIEF***

    a.  Deny the Debtor's Motion for Implementing the Automatic Stay;

    b.  Grant the Movant's Motion because the Debtor failed to comply with the Contested Matter Procedures, as defined by Federal Rule of Bankruptcy Procedure 9014 and effective as of January 22, 2018;

    c.  The Movant's interest in the Property is not adequately protected and the equity is depreciating and further delay will prejudice the movant;

    d.  The Debtor is in material default of his obligations due to the Movant and the Movant is entitled by law to pursue the foreclosure proceeding; and

    e.  Grant the Movant's request for Relief from Stay to allow the Movant to take title to the Property.

**WHEREFORE,** the Movant respectfully requests that the Court enter an order:

(A) Grant the Movant's Motion because the Debtor failed to comply with the Contested Matter Procedures, as defined by Federal Rule of Bankruptcy Procedure 9014 and effective as of January 22, 2018;

(B) Grant the Movant relief from the automatic stay with prejudice in effect pursuant to Bankruptcy Code §362(a);

(C) Grant the Movant relief from the automatic stay to allow the Movant to proceed with non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property by virtue of the Debtor's failure to redeem the property;

(D) Grant such other and further relief as to the Court may seem just and proper.

Dated at North Haven, Connecticut, this 14th day of February, 2018.

THE MOVANT,
**NUTMEG FINANICAL HOLDINGS, LLC**

BY: _____

**ALANA T. DECHELLO**
DECHELLO LAW FIRM, LLC
110 Washington Avenue
North Haven, CT 06473
Telephone: (203) 234-2225
Fax: (203) 234-6324
Federal Bar No.: ct30288
Email: ad@dechellolaw.com

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

============================================

**IN RE:**

**CHARLES HARDING BYRD,**
**Debtor\***

**NUTMEG FINANCIAL HOLDINGS,**
**LLC**
**Movant**

**ROBERTA NAPOLITANO**
**, Trustee**

**CASE NO. 18-30218 (JAM)**

**CHAPTER 13**

**FEBRUARY 14, 2018**

### NOTICE OF CONTESTED MATTER RESPONSE DATE

**NUTMEG FINANCIAL HOLDINGS, LLC,** (the "Movant") has filed a **MOTION FOR (a) RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§362 (d)(1) AND (2)(A) AND (B) OR, IN THE ALTERNATIVE, ADEQUATE PROTECTION**, (the "Contested Matter") with the U.S. Bankruptcy Court. Notice is hereby given that any response to the Contested Matter must be filed with the Court no later than **TWENTY ONE (21) DAYS** which is **MARCH 7, 2018,** in accordance with the Federal Rules of Bankruptcy Procedure 9014. In the absence of a timely filed response, the proposed order in the Contested Matter may be entered without further notice and hearing see, 11 U.S.C. § 102(1). Dated at North Haven, Connecticut, this 14TH day of February, 2018.

**THE MOVANT,**
**NUTMEG FINANICAL HOLDINGS, LLC**

BY: _____

**ALANA T. DECHELLO**
DECHELLO LAW FIRM, LLC
110 Washington Avenue
North Haven, CT 06473
Telephone: (203) 234-2225
Fax: (203) 234-6324
Federal Bar No.: ct30288
Email: ad@dechellolaw.com

\*Pursuant to Federal Rule of Bankruptcy Procedure 9006(f), if service is made by mail, three days are added after the response date set in this notice.

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### NEW HAVEN DIVISION

==================================

**IN RE:**

**CHARLES HARDING BYRD,**
**Debtor***

**NUTMEG FINANCIAL HOLDINGS,**
**LLC**
**Movant**

**ROBERTA NAPOLITANO**
**, Trustee**

**CASE NO. 18-30218 (JAM)**

**CHAPTER 13**

**FEBRUARY 14, 2018**

### <u>PROPOSED ORDER GRANTING RELIEF FROM STAY WITH PREJUDICE</u>

**NUTMEG FINANCIAL HOLDINGS, LLC**, (the "Movant"), filed a Motion for Relief from Stay With Prejudice (the "Motion"), ECF No.____. After notice and a hearing, see 11 U.S.C. § 102(1) and in compliance with the Court's Contested Matter Procedure, and it appearing that the relief sought in the Motion should be granted, it is hereby:

**ORDERED**, that the automatic stay provided in 11 U.S.C. § 362(a) is modified pursuant to 11 U.S.C § [362(d)(1)/362(d)(2)] to permit the Movant and/or their succesors and assignees, to exercise their rights, if any, with respect to the REAL PROPERTY KNOWN AS, 78 HULL STREET, ANSONIA, CT, in accordance with applicable non-bankruptcy law.

And it is **FURTHER ORDERED**, that to the extent there exists a co!debtor, the automatic stay pursuant to 11 U.S.C. § 362(a) and the fourteen (14) day stay pursuant to Fed. R. Bankr. P. 4001(a)(3) are modified to allow the Movant to enforce its interests in the real property against such co-debtor.

*For the purposes of this order, "Debtor" means "Debtors" where applicable.

Date:                    _____
                         Ann M. Nevins
                         United States Bankruptcy Judge

*Exhibit A*

VP 0 3 8 1 PG 0 5 6 1

# ADJUSTABLE RATE NOTE
(1 Year Treasury Index—Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| May 12, 2003 | ANSONIA | CT |
|---|---|---|
| [Date] | [City] | [State] |

78 Hull Street, Ansonia, CT 06401

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 275,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

**NAUGATUCK SAVINGS BANK.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       3.750 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

(A)  Time and Place of Payments                Interest only will be payable monthly in arrears
                                                during the construction period on amount advanced.
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on       **July 1, 2004**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on       **June 1, 2034**       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**87 CHURCH STREET, NAUGATUCK, CT 06770**

or at a different place if required by the Note Holder.

(B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 1,273.57       . This amount may change.

(C)  Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE—ARM 5-1—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-1/5-1/6-1 ARM                                                    Form 3501 1/01

                                                                            GREATLAND ■
ITEM 2962L1 (0011)                        *(Page 1 of 4 pages)*       To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
   (A)  Change Dates
   The interest rate I will pay may change on the first day of _____ July, 2004 _____, and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."
   (B)  The Index
   Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
   If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
   (C)  Calculation of Changes
   Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and Three Quarters** percentage points ( _____ 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
   The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
   (D)  Limits on Interest Rate Changes
   The interest rate I am required to pay at the first Change Date will not be greater than _____ 4.750 % or less than _____ 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than _____ 9.750 %.
   (E)  Effective Date of Changes
   My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.
   (F)  Notice of Changes
   The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.  BORROWER'S RIGHT TO PREPAY
   I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
   I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.  LOAN CHARGES
   If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

MULTISTATE ADJUSTABLE RATE NOTE—ARM 5-1—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-1/5-1/6-1 ARM                                                                     Form 3501 1/01

ITEM 2062L2 (0011)                        (Page 2 of 4 pages)              GREATLAND ■
                                                          To Order Call: 1-800-530-9393 □ Fax 616-791-1131

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this

MULTISTATE ADJUSTABLE RATE NOTE—ARM 5-1—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-1/5-1/6-1 ARM                                                                                     Form 3501 1/01

ITEM 2062L3 (0011)                              *(Page 3 of 4 pages)*                   GREATLAND ■
                                                                                 To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 4 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
Charles H. Byrd III          -Borrower      Helyn J. Byrd          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                                  -Borrower

*[Sign Original Only]*

MAY 1 5 2003

*Received for Record*
*By*

MULTISTATE ADJUSTABLE RATE NOTE—ARM 5-1—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-1/5-1/6-1 ARM                                          Form 3501 1/01

ITEM 2062L4 (0011)          *(Page 4 of 4 pages)*          GREATLAND ■
                                                          To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

# ADJUSTABLE RATE RIDER
### (1 Year Treasury Index—Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this    12th    day of    May, 2003    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Adjustable Rate Note (the "Note") to

**NAUGATUCK SAVINGS BANK**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**78 Hull Street, Ansonia, CT 06401**

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of    3.750 %. The Note provides for changes in
the interest rate and the monthly payments as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A)  Change Dates**
The interest rate I will pay may change on the first day of    July, 2004    ,
and on that day every 12th month thereafter. Each date on which my interest rate could change is called a
"Change Date."
**(B)  The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as
made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days
before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon
comparable information. The Note Holder will give me notice of this choice.
**(C)  Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding
**Two and Three Quarters**
percentage points (    2.750 %) to the Current Index. The Note Holder will then round the result of
this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in
Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

MULTISTATE ADJUSTABLE RATE RIDER--ARM 5-1--Single Family--
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-1/5-1/6-1 ARM                                            Form 3108 1/01

                                                                     GREATLAND ■
ITEM 20611 1 (0011)                *(Page 1 of 3 pages)*        To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than        **4.750 %** or less than        **2.750 %.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than        **9.750 %.**

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER—ARM 5-1—Single Family—
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-1/5-1/6-1 ARM                                                                     Form 3108 1/01

GREATLAND ■
ITEM 2061L2 (0011)                          *(Page 2 of 3 pages)*                To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages
1 through 3 of this Adjustable Rate Rider.

_____ (Seal)
Charles H. Byrd III                    -Borrower

_____ (Seal)
Helyn J. Byrd                          -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

**MULTISTATE ADJUSTABLE RATE RIDER—ARM 5-1—Single Family—**
**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Fannie Mae 4-1/5-1/6-1 ARM**

Form 3108 1/01

ITEM 2061L3 (0011)                    *(Page 3 of 3 pages)*

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

W 0387 PG 0560



# NAUGATUCK SAVINGS BANK

**LENDING DEPARTMENT**

87 Church Street   •   Naugatuck, CT 06770

(203) 720-5354                    Fax (203) 720-4100

---

## CONSTRUCTION CLAUSE

Whereas buildings on said premises are in process of construction and whereas the said grantee has agreed to make the loan herein described to be paid over to said grantor(s) in installments as the work progresses, the time and amount of each advancement to be made at the sole discretion and upon the estimate of said grantee, so that when all of the work on said premises has been completed to the satisfaction of said grantee, said grantee shall then pay over to said grantor(s) any balance necessary to complete the full loan of $275,000.00; and whereas the grantor(s) agree(s) to complete the erection of said building to the satisfaction of said grantee within a reasonable time from the date or at the latest on or before 13 months from this date.

Charles H. Byrd III                         Date 5/12/03

Helyn J. Byrd                               Date 5/12/03

RECEIVED FOR RECORD
MAY 1 3 2005
3:20

Secretary of State/Bill Ott, Attest
Michael Van Valkenburgh
Town Clerk

000219

VOL 0 9 8 1 PG 0 5 4 5



After Recording Return To: NAUGATUCK SAVINGS BANK
87 CHURCH STREET
NAUGATUCK CT. 06770

———————— [Space Above This Line For Recording Data] ————————

# OPEN-END MORTGAGE DEED

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **May 12, 2003**, together with all Riders to this document.
(B) "Borrower" is Charles H. Byrd III and Helyn J. Byrd

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is NAUGATUCK SAVINGS BANK
Lender is a **CORPORATION** organized and existing under
the laws of **CONNECTICUT**. Lender's address is
**87 CHURCH STREET, NAUGATUCK, Connecticut, 06770**

. Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated **May 12, 2003**. The Note
states that Borrower owes Lender **Two Hundred Seventy Five Thousand Dollars And No Cents**
Dollars (U.S. $ **275,000.00**) plus interest. Borrower has promised
to pay this debt in regular Periodic Payments and to pay the debt in full not later than **June 1, 2034**.
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] Second Home Rider

[ ] Balloon Rider [ ] Planned Unit Development Rider [X] Other(s) [specify]
"Schedule A" and "Construction Clause"
[ ] 1-4 Family Rider [ ] Biweekly Payment Rider

CONNECTICUT—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
ITEM 1855L1 (0011)                         *(Page 1 of 11 pages)*

Form 3007 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to Lender and Lender's successors and assigns, the following described property located in the **County** of
[Type of Recording Jurisdiction]

**New Haven**                    :
[Name of Recording Jurisdiction]

See "Schedule A" attached hereto and made a part hereof.

which currently has the address of                 **78 Hull Street,**
[Street]

**Ansonia,**          , Connecticut     **06401**      ("Property Address"):
[City]                    [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a

part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and

CONNECTICUT—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1855L3 (0011)

*(Page 3 of 11 pages)*

Form 3007 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower

subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be

responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

---

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19,

CONNECTICUT—Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1855L7 (0011)

*(Page 7 of 11 pages)*

Form 3007 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

CONNECTICUT—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1855L8 (0011)

*(Page 8 of 11 pages)*

Form 3007 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the

other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

23.  **Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  **Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

25.  **Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Charles H. Byrd III                              -Borrower

_____ (Seal)
Helyn J. Byrd                                      -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

Signed, sealed and delivered in the presence of:

WILLIAM P. TUCCIO                          PAULA J. FREEMAN

State of Connecticut
County of NEW HAVEN                    ss.    ANSONIA

The foregoing instrument was acknowledged before me this    **Monday, May 12, 2003**    (date) by

CHARLES H. BYRD, III  &  HELYN J. BYRD                (person[s] acknowledging).

WILLIAM P. TUCCIO                          XXXXXXXX
COMMISSIONER OF THE SUPERIOR COURT

XXXXXXXXXXXXXXXX

CONNECTICUT—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3007 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

ITEM 1855L11 (0011)                    *(Page 11 of 11 pages)*

## SCHEDULE "A"

All that certain piece or parcel of land with all the buildings and improvements thereon, situated in the City of Ansonia, County of New Haven and State of Connecticut, bounded and described as follows:

Commencing at a point on the Northerly side of Hull Street at the Southeasterly corner of land now or formerly of one Hanke; thence Northerly two hundred and fifteen (215) feet more or less along land now or formerly of said Hanke to point on the Southerly side of a forty-five (45) foot passway, said point being marked by a stone monument set in the ground; thence Easterly along the Southerly side of said passway a distance of one hundred (100) feet; thence Southerly along land now or formerly of the Estate of William Boone a distance of two hundred and fifteen (215) feet more or less to the Northerly side of Hull Street; thence Westerly along the Northerly side of Hull Street a distance of one hundred (100) feet to point of commencement.

Being the same premises conveyed by Quit Claim Deed from James Edward Brown to Charles H. Byrd and Gladys E. Byrd, in survivorship.

10-52001896

*Exhibit C*

Name(s): __Charles H. Byrd III__   Date of this Agreement: __December 12, 2003__

__Helyn J. Byrd__

Address: __78 Hull Street__   Final Maturity Date: __October 17, 2013__

__Ansonia, CT 06401__

Account No: __1052001896__   Initial Credit Limit: $ __25,000.00__

## Naugatuck Savings Bank

### Home Equity Line of Credit Note and Loan Agreement

### I.   WHAT SOME OF THE WORDS MEAN.

"*We*," "*us*," "*our*" and "*bank*" mean Naugatuck Savings Bank, 251 Church Street, Naugatuck, Connecticut 06770 and what are called its "*successors and assigns*."

"*You*," "*your*" and "*yours*" mean **each** person who signs this Agreement on one of the lines labeled "*Signature to Note and Loan Agreement*".

"*Account*" means the Home Equity Line of Credit Account. This Agreement begins and the Account is opened on the Date of this Agreement.

"*Special Checks*" are the checks you can properly use to borrow money under this Agreement. This Agreement gives you the right to use Special Checks to get Loan Advances. This is called the "*Plan*."

"*Loan Advances*" mean the amounts we advance to you under this Agreement.

"*Fees*" mean any late payment fees, return check fees, and membership fees.

"*Daily Balance*" is the balance on which we calculate interest. It is also called the balance subject to Finance Charge.

### II.   SUMMARY OF THE COST OF CREDIT AND PROVISIONS FOR COLLATERAL.

**(1)   INTEREST.** You agree to pay a Finance Charge consisting of interest. This Finance Charge consisting of interest (sometimes simply referred to as "*interest*") begins on the date as of which a Loan Advance is posted to your Account.

**(2)   PERIODIC RATE.** We use a daily periodic rate to compute the interest on your Account. The daily periodic rate in effect on active accounts (with the same index and Discount) which are on a regular billing cycle on the date of this Agreement is __0.010959__ %. The corresponding ANNUAL PERCENTAGE RATE for this periodic rate is __4.000__ %. The Annual Percentage Rates described in this Agreement do not include costs other than interest.

**(3)   VARIABLE RATE.** The daily periodic rate and Annual Percentage Rate may go up each billing cycle in the manner described below.

(a)   Your daily periodic rate and Annual Percentage Rate may change on the first day of each billing cycle. The dates on which the daily periodic rate and Annual Percentage Rate may change are sometimes called "Change Dates".

(b)   For the first twelve (12) regular billing cycles, on each Change Date, your interest rate will be recomputed to equal *The Wall Street Journal* "Prime Rate" minus a discount of __ZERO__ percentage points (the "Discount"). *The Wall Street Journal* "Prime Rate" (the "Index") is the rate published in *The Wall Street Journal*, Eastern Edition ("*The Journal*"), under the designation "Money Rates" and shown as "prime rate" or "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" or similar wording used by *The Journal* for that index. If more than one rate is shown we will use the highest.

(c)   Starting with the thirteenth (13th) regular billing cycle, on each Change Date your interest rate will be recomputed to equal the Index plus a margin of __0.00__ percentage point(s) (the "Margin").

(d)   On each Change Date, we use the last index published in *The Journal* before the start of the billing cycle. For the first twelve (12) regular billing cycles, that rate minus the Discount gives us the ANNUAL PERCENTAGE RATE for the billing cycle (subject to the limitations described in (g) below). Starting with the thirteenth (13th) regular billing cycle, the Index rate plus the Margin gives us the ANNUAL PERCENTAGE RATE for the billing cycle (subject to the limitations described in (g) below).

We divide the Annual Percentage Rate by 365 to get the daily periodic rate for the billing cycle. Any increase or decrease in the interest rate will take effect on the first day of the billing cycle.

(e)   By way of example, if we were to calculate your interest rates by adding the Margin to the Index figure published in *The Journal* as of __December 10, 2003__, we would get an ANNUAL PERCENTAGE RATE of __4% and a__ corresponding daily periodic rate of __0.010959__%.

(f)   On each Change Date, if the applicable Index we use goes up, your interest rate will go up. As a result, you will owe us more interest, and your minimum payment will increase accordingly. At the start of the thirteenth (13th) regular billing cycle, your interest rate may go up even if the Index stays the same or goes down. This is because starting with the thirteenth (13th) regular billing cycle, we will change from calculating your interest rate based on the Index and Discount to calculating your interest rate based on the Index and Margin.

(g)   In no case, however, will your MAXIMUM ANNUAL PERCENTAGE RATE increase above __18.000__ % (the "lifetime cap") nor go below the MINIMUM ANNUAL PERCENTAGE RATE of __0.00%__ (the "lifetime floor").

(h)   If the Index becomes unavailable at any time through the first twelve (12) regular billing cycles, we can change to a new index, discount, and margin. We must choose a new index which has an historical movement substantially similar to that of the original Index. Also, any new index and discount that we select would have to result in an annual percentage rate substantially similar to the rate in effect at the time the original Index became unavailable. The new margin that we select, when added to the new index, would have to result in an annual percentage rate substantially similar to the rate that is calculated by adding the original Index to the original margin that would have been in effect on the date the original Index became unavailable.

(i)   If the Index becomes unavailable after the first twelve (12) regular billing cycles, we can change to a new index and margin. We must choose a new index which has an historical movement substantially similar to that of the original Index. Also, any new index and margin that we select would have to result in an annual percentage rate substantially similar to the rate in effect at the time the original Index became unavailable.

GREATLAND ■
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

**(4)  DAILY BALANCE.** We figure the Finance Charge consisting of interest for the billing cycle by applying the daily periodic rate to the Daily Balances of your Account (including current transactions). To get the Daily Balance for each day, we take the beginning balance of your Account for that day, add any new Loan Advances and any Fees added to the balance subject to Finance Charge, and then subtract any payments and credits. At the end of the billing cycle, all of the Finance Charges consisting of interest for each day of the billing cycle are added up to get the Finance Charge consisting of interest for the entire cycle.

Fees and Finance Charges are not included in the Daily Balance during the billing cycle on which they are charged and appear on your bill. They become part of the Daily Balance at the start of the next billing cycle after they are charged.

**(5)  MINIMUM PAYMENT.** You must make a payment each month. We will send you a bill for a monthly billing cycle when you have a balance. We will show on each bill the amount due for that monthly bill (*"Minimum Payment"*) and the date when the Minimum Payment is due. The Minimum Payment shown on each bill will equal (i) interest and Fees for the monthly billing cycle shown on that bill plus (ii) any unpaid interest and any unpaid Fees from prior bills.

Paying only the Minimum Payment will not pay any of the principal balance of Loan Advances. (The Minimum Payment does pay interest charges and Fees which at the end of each monthly billing cycle become part of the principal.) Thus, if you pay only the Minimum Payment each month, at the end of the loan, you will be required to pay the entire balance on the Final Maturity Date in a single lump sum ("balloon") payment.

**(6)  FINAL MATURITY DATE.** You can obtain Loan Advances for approximately nine (9) years and ten (10) months. More specifically, the Agreement and the Plan will end on the date shown on the top of Page 1 as the *"Final Maturity Date"*. This is the final **maturity** of all debts under this Agreement. All amounts under this Agreement are due and payable on that day.

**(7)  CHARGES PAID AT OR BEFORE CLOSING.**
**(a)  Application Charge.** At the time you applied for an Account, you should have paid us a FINANCE CHARGE consisting of an application fee of $0.
**(b)  Mortgage Related Charges.** You agree to pay the following indicated mortgage-related charges.

| | |
|---|---|
| Title examination | $ |
| Title insurance | $ |
| Credit report | $ |
| Appraisal charge | $ |
| Mortgage filing charge | $ |
| Lawyer's charge for preparation of closing documents and other incidental legal services | $ |

**(8)  FEES IMPOSED DURING THE LIFE OF THE ACCOUNT.** You agree to pay the following Fees.
**(a)  Late Payment Fee.** If we do not receive the full amount of your Minimum Payment on or before the last business day of the calendar month in which your payment is due, we may charge you a late payment fee of 5% of the interest portion of your Minimum Payment not received by such day or $10.00, whichever is greater.
**(b)  Return Check Fee.** If a check you use to make payment on your Account (*not a Special Check*) is returned unpaid, we may charge you a fee of $20.00.
**(c)  Membership Fee.** You agree to pay a membership fee each year. The fee will be billed to your Account during the month in which falls the anniversary of the Date of this Agreement. The fee will be $35.00 per year. We can waive this fee in any year without losing the right to charge it in later years.
**(d)  Recapture of Fees Paid.** If you close this line within two years you will be responsible for expenses paid to third parties, incurred by the bank, in establishing this loan.

**(9)  MORTGAGE AND INSURANCE.** This Agreement is secured by a mortgage ("*Mortgage*") on residential real estate located at 78 Hull Street Ansonia, CT 06401
(the "*Property*"). The Mortgage requires that the Property be insured against loss by fire, such perils included within a broad form of an "*all risk (which are not otherwise excluded)*" type of insurance coverage generally available to homeowners. You also agree to provide coverage for such other perils as we may specifically require (including flood insurance, if applicable). Whether or not you are an owner of the Property, you agree to see that such insurance is obtained and that all other terms of the Mortgage are complied with.

You can get this required property insurance (including any required flood insurance) from anyone you want, if we approve them. We may withhold approval only for reasonable cause. You cannot buy property insurance through us.

**(10)  TAX IMPLICATIONS.** You should consult a tax advisor regarding the deductibility of interest, charges and Fees under this Agreement.

**(11)  BILLING ERRORS.** Your rights and responsibilities with regard to billing errors are explained at the end of this Agreement under the heading: *"Your Billing Rights."*

**III.  PROMISE TO PAY AND TO FOLLOW THIS AGREEMENT.**

**(1)  YOUR RIGHT TO BORROW.** You have applied for and we have granted to you the right to borrow money under this Agreement. After signing this Agreement, if the Property is a principal dwelling, we will provide three business days to cancel as explained in the *"Notice of Right to Cancel"*. After we are satisfied that there has been no cancellation during this period, you can each borrow money by writing Special Checks up to your credit limit. No matter which of you writes one or more Special Checks, each of you will be responsible for paying back all money loaned under this Agreement.

You agree to repay all of the Loan Advances, plus interest, any Fees and any other amounts you owe us. We will continue to charge you interest in the manner described above in Section II until all of those items are fully paid, whether before or after maturity, by acceleration or otherwise. You also agree to follow all the terms of this Agreement.

**(2)  USE OF SPECIAL CHECKS.** Special Checks *must be used primarily for personal, family or household purposes*. Each Special Check must be for at least $500. Special Checks should only be used so that the total amount that you owe us under the Plan is not more than your credit limit. You agree not to use a Special Check to pay the interest or any other amount you owe us under this Agreement.

(3) **LOAN ADVANCES.** When we receive a Special Check, you authorize and direct us to pay it by lending to you the amount of the Special Check. You agree that we may hold a Special Check, for the time allowed by law, if we think it advisable, until we can be sure that you wrote it.

(4) **REFUSAL TO HONOR.** Our Loan Advances are not discretionary. We can refuse to "*honor*" a proper Special Check only if we have declared you to be in default, as defined below, or you or we have suspended or canceled use of the Plan as provided below, or if the proper Special Check would cause you to go over your credit limit, or if you have properly and in a timely fashion stopped payment on the Special Check as explained below. Otherwise, we must "*honor*" the proper Special Check by making a Loan Advance.

(5) **PREPAYMENT.** You may repay your Account balance in whole or in part at any time. Any amount you repay will then be available to you to reborrow up to your credit limit. You can even pay back the entire balance, and reduce the Account balance to zero (0). Unless you or we terminate the Account, if you reduce your Account balance to zero (0), the Account will remain open for future Loan Advances, and the Mortgage will remain in effect as security for all such Loan Advances.

(6) **ACCELERATION.** We can declare you to be in default, terminate the Plan and require immediate repayment of the entire outstanding balance of your Account in a single payment ("*accelerate*") in any one of the following events (called "*Events Of Default*"):
    (a)  if there is fraud or material misrepresentation by you in connection with the Account.
    (b)  if you fail to meet repayment terms of this Agreement for any outstanding balance.
    (c)  if any action or inaction by you adversely affects our security in the Mortgage or any right of ours in the Mortgage.
If we do accelerate and bring a lawsuit to collect, you agree to pay our court costs and reasonable attorneys fees, as allowed by law. We will only accelerate if allowed by this Agreement and by law. If we decide to accelerate, we can do so without advance notice to you.
Certain events of default under the Mortgage can also be Events of Default under this Agreement. The Mortgage itself provides that we can accelerate **IF** (a) any payment required under the Mortgage is not paid when due; or, with certain exceptions provided by law, any of the Property has been conveyed or taken by process or operation of law; or upon default in the performance of any other agreement contained in the Mortgage; **and** (b) such event constitutes an action or inaction by you which adversely affects our security in the Mortgage or any right of ours in the Mortgage.

(7) **SUSPEND YOUR USE OF THE PLAN OR REDUCE YOUR CREDIT LIMIT.** We can suspend use of the Plan and stop further Loan Advances to you or we can reduce your credit limit during any period set forth below.
    (a)  We can do this during any period during which the value of the Property declines significantly below the appraised value used for purposes of the Plan.
    (b)  We can do this during any period when we reasonably believe you will be unable to fulfill the repayment obligations under this Agreement because of a material change in your financial circumstances.
    (c)  We can do this during any period when you are in default of any "*material*" obligation under this Agreement. "*Material*" obligations (i) **include** those obligations pertaining to payments due (set forth in Section II(5) above), and ownership and insurance of the Property (set forth in section II(10) above) and (ii) **may include** other provisions which are important to us.
    (d)  We can do this during any period when we are prevented by governmental action from imposing the Annual Percentage Rate provided for in this Agreement.
    (e)  We can do this during any period when the priority of our Mortgage is hurt by governmental action to the extent that the value of our interest in the Property is less than 120% of the credit limit.
    (f)  We can do this during any period when we are notified by our regulatory agency that continued Loan Advances would constitute an unsafe and unsound practice.
    (g)  We can do this during any period when the interest rate being charged on your Account would equal or exceed the Annual Percentage Rate "*lifetime cap*" described in Section II(3)(e) above.
    (h)  We can do this during any period when an Event of Default is occurring.
If we decide to suspend the Plan or reduce your credit limit, we can do so without advance notice to you, but we will notify all of you (and the owners of the Property) in writing, within (3) business days after the action is taken.

(8) **CHANGE IN TERMS.** We can change the terms of this Agreement upon 15 days notice (a) if the change will unequivocally benefit you throughout the remainder of this Agreement, or (b) if you agree in writing to the specified change at that time or (c) if it is an insignificant change in terms, or (d) if the change is otherwise permitted by applicable law.

(9) **YOUR RIGHT TO STOP FUTURE ADVANCES.** Any one of you can direct us not to make future Loan Advances by providing us with written notice at our main lending office at 87 Church Street, Naugatuck, CT directed to the attention of the Lending Department. Unless the law provides an earlier effective date for the notice, your request will not be binding on us until we have had a reasonable opportunity to act upon your request (but no later than two business days after we receive your notice.)
If that same person who gives us the written notice subsequently requests reinstatement in writing, we will honor such a request, unless an event set forth in Paragraph III(6) or III(7) permits us to accelerate or suspend use of the Plan. Your request for reinstatement must be mailed or delivered to our main lending office at 87 Church Street, Naugatuck, CT, and directed to the attention of the Lending Department.

## IV. **OTHER PROVISIONS OF THIS AGREEMENT.**

(1) **CURRENT FINANCIAL INFORMATION.** You agree to give us your current financial information when we ask for it and to tell us immediately if your financial condition changes for the worse at any time.

(2) **SALE OF PROPERTY.** You agree to tell us at least ten (10) days in advance if the Property is scheduled to be sold so that, except where prohibited by law, we can arrange to have your Account paid off at the sale. After the sale your right to use the Plan will be canceled.

(3) **OUR WAIVERS.** We have by law the right of "*set off.*" This is a right to take or "*set off*" certain funds in deposit account(s) you have with us, to pay off what you owe under this Agreement. Under other agreements with you, we may also have rights of set off. In connection with this Agreement, we are giving up ("*waiving*") any of those rights and we will assert only the "*set off*" rights given to us by law.

We also waive the application of any other security agreement or mortgages, other than the ones described in the Mortgage, to amounts owing under this Agreement.

**(4)  OUR DELAY IN ENFORCEMENT.** We can delay in using any of our rights under this Agreement without losing them. Even if we do not use our rights at any one time, we may use them at a later time.

**(5)  EACH OF YOU WHO SIGNS IS LIABLE.** If you are signing this Agreement with any other person or persons, each of you is obliged to pay the **entire** amount owing under this Agreement. Among other provisions, as long as the Plan is in place, when any of you sign a Special Check, you sign for yourself and for the other(s) of you. If any of you stop your right to future use of the Plan by taking the steps described in paragraph III(9), we will stop the Plan for all of you, but all of you remain obligated to pay all amounts due under this Agreement.

We may require **any** of you to pay any amount without asking any other(s) of you to pay. We do not have to notify you that the amounts due under this Agreement have not been paid by any other(s) of you. We and any of you can repeatedly agree to extend this Agreement for as long as we want, release any of the collateral or release anyone from liability under this Agreement, without notifying any other(s) of you or releasing any other(s) of you from your responsibility under this Agreement. In other words, the obligation of each of you is absolute and not conditioned on anything.

**(6)  NO CERTIFICATIONS OF SPECIAL CHECKS ALLOWED.** You may not require us to certify a Special Check, except where we are required by law to do so.

**(7)  LOST OR STOLEN SPECIAL CHECKS.** You agree to call the telephone number shown on your bill **immediately** if you learn that any of your Special Checks are lost or stolen. Unless otherwise provided by law, you agree that we will not be liable for the unauthorized use of your Special Checks as long as we have acted with good faith and ordinary care.

You must use a high degree of care in keeping and using your Special Checks.

**(8)  STOP PAYMENT.** If you wish to stop payment on a Special Check, you may send us a stop payment order by writing to us at Naugatuck Savings Bank, 251 Church Street, Naugatuck, CT 06770, Attention: Check Processing Department, or telephone us at (203) 729-5291. You must give us your Account Number, the Special Check number, its exact amount and date, and the person(s) to whom it was payable. Your stop payment order will **not** be effective if the Special Check was paid by us before we had a reasonable opportunity to act on the order or you did not give us the information we needed to allow us to catch it.

An **oral** stop payment is binding on us only for 14 days unless continued by you in writing during that period. A **written** stop payment order is good for six months, unless you extend it in writing.

**(9)  GOVERNING LAW AND ENFORCEABILITY.** This Agreement will be governed by the laws of Connecticut and the United States. If any part of this Agreement is found to be invalid, illegal or unenforceable by a court or agency, the other parts of this Agreement will stay valid and enforceable and will be read as if the invalid part had **not** been included.

**(10)  COPY.** You **each** acknowledge getting a separate copy of this Agreement on the Date of this Agreement shown at the top of page 1. If you are not an owner of the Property, you also acknowledge getting a copy of the Mortgage. Finally, you acknowledge getting (when you received an application for the Account), a copy of the disclosure entitled *"Important Terms of Our Home Equity Line Account* and the brochure entitled *"When Your Home is on the Line: What You Should Know about Home Equity Lines of Credit"*. This Agreement, the Mortgage, the brochure and that separate disclosure contain important information, so please review them carefully and keep them for your records.

1.  _____
Signature to Note and Loan Agreement  Charles H. Byrd III

2.  _____
Signature to Note and Loan Agreement  Helyn J. Byrd

3.  _____
Signature to Note and Loan Agreement

---

**SIGNATURES OF NON-BORROWER MORTGAGOR(S)**

Each of those signing below have an ownership interest in the Property but are not authorized to borrow under this Agreement. Each of those signing below are not directly, personally obligated to repay the amounts due under this Agreement, but are giving a mortgage on the Property to secure that indebtedness. Each of those signing below acknowledges getting one copy of this entire document as a disclosure of its terms.

_____     _____     _____

_____     _____     _____

---

**SEE THE NEXT PAGE FOR IMPORTANT BILLING RIGHTS INFORMATION**

## YOUR BILLING RIGHTS

This notice contains important information about your rights and our responsibilities under the applicable Fair Credit Billing laws.

**Notify Us in Case of Errors or Questions About your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at Naugatuck Savings Bank, 251 Church Street, Naugatuck, Connecticut 06770 Attention: Loan Servicing Department. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information

* Your name and account number.
* The dollar amount of the suspected error.
* Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including Finance Charges consisting of interest, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any Finance Charges consisting of interest related to any questioned amount. If we didn't make a mistake, you may have to pay Finance Charges consisting of interest, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

# ALLONGE TO CONSUMER RESIDENTIAL NOTE

This allonge is affixed to and becomes a permanent part of the following described Note:

Original lender: Naugatuck Savings Bank.

Note Date: December 12, 2003

Original Principal Balance: $25,000.00

Borrowers: Charles J. Byrd III & Helyn J. Byrd

Property Address:  78 Hull Street, Ansonia CT 06401

Without recourse, pay to the order of Nutmeg Financial Holdings, LLC, its successors assigns as Their interests may appear.

Date: **3-22-13**                                  Naugatuck Savings Bank

by: _____
                                         Bruce Noe
                                         its duly authorized VP Senior
                                         Residential Loan Officer

*Exhibit D*

## NAUGATUCK SAVINGS BANK

### OPEN-END MORTGAGE
#### ADJUSTABLE RATE HOME EQUITY LINE OF CREDIT ACCOUNT

TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, GREETINGS:

KNOW YE, that Helyn J. Byrd  Charles H. Byrd III  of the Town Ansonia of County of NEW HAVEN and the State of Connecticut (hereinafter individually and collectively referred to as the "*Mortgagor*," in the singular, and in the masculine gender, regardless of actual gender or number of actual mortgagors), for the consideration of the indebtedness and promises herein recited, does hereby give, grant, bargain, sell and confirm unto NAUGATUCK SAVINGS BANK, 251 Church Street, Naugatuck, Connecticut 06770 (hereinafter referred to as "*Bank*"), its successors and assigns forever, the following described property all that certain piece or parcel of land with the buildings and all other improvements now or hereafter placed thereon and all appurtenances thereof, situated in the Town of Ansonia County of NEW HAVEN and State of Connecticut, a description of which is more particularly set forth on Schedule A which is attached hereto and made a part hereof, and which has the address of 78 Hull Street, Ansonia , Connecticut  06401 (herein the "*Property Address*");

Together with all improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and shall remain a part of the property covered by this mortgage (all of the foregoing, together with said property are referred to in this mortgage as the "*Property*");

TO HAVE AND TO HOLD such Property unto the Bank, and its successors and assigns, forever.  The Mortgagor, for himself and his heirs, executors, administrators, successors and assigns, also covenants with the Bank, and its successors and assigns that at and until the execution and delivery of this mortgage, he is the owner of the Property in fee simple and has good right, full power and lawful authority to bargain, sell, and convey the same in manner and form evidenced by this mortgage, and that the Property is free from all encumbrances, except for encumbrances which are prior in record as of the date of the recording of this mortgage.  Moreover, the Mortgagor, on behalf of himself and his heirs, executors, administrators, successors and assigns, hereby warrants and agrees to defend the Property to and for the Bank and its successors and assigns forever against all claims and demands except for encumbrances which are prior in record as of the date of the recording of this mortgage.

THE PURPOSE OF THIS MORTGAGE is to secure loan advances made by the Bank to Charles H. Byrd III and Helyn J. Byrd  (also sometimes herein called the "*Borrower(s)*" pursuant to a consumer revolving loan agreement entitled Home Equity Line of Credit Note and Loan Agreement and dated 12/12/2003 (hereinafter the "*Agreement*"), as well as interest and other amounts due to Bank under the Agreement and this mortgage.  A copy of the Agreement may be obtained from Bank at the address listed above.  Pursuant to the Agreement, Bank has agreed to make future advances to the Borrower up to a predetermined "Credit Limit" of $25,000.00.  Such future advances are more fully described in Paragraph 15 hereof.  If not sooner paid, the entire loan balance matures and is due and payable on, and there will be no future advances after, the "*Final Maturity Date*" of  10/17/2013.

The Mortgagor also agrees with the Bank to the following:

1.  CHARGES; LIENS:  Mortgagor will pay all taxes, assessments and other charges, fines, and impositions attributable to the Property which may attain priority over this mortgage, and the Mortgagor will promptly furnish to Bank on request receipts or copies of receipts for those payments.  Mortgagor will fully and promptly perform all obligations under any lien or mortgage on the Property which has priority over this mortgage (hereinafter referred to as a "*Prior Mortgage*").

2.  HAZARD INSURANCE:  Mortgagor will keep the improvements now existing or hereafter erected on the Property insured against loss by fire, perils included within a broad form of "*all risks (which are not otherwise excluded)*" coverage generally available to homeowners, and any other perils (such as flood) that Bank may require and in the amounts and for the periods that Bank may require.  If Bank does not specify otherwise, such insurance shall be at least equal to the lesser of (A) the maximum replacement value of the insurable structures on the Property or (B) the Credit Limit plus the outstanding principal balance and potential future advances secured by any and all Prior Mortgages.  In any event, the amount of coverage must be sufficient to prevent the application of any co-insurance clause.  If the insurance coverage provides for (A) above, the policy shall specifically provide for full replacement value, regardless of the face amount of the policy.  In the event flood insurance is required by the Bank, the amount of such insurance shall at least be equal to the minimum amount required under federal flood insurance laws.  If Mortgagor fails to obtain and/or maintain the insurance coverage required by the Bank (including, without limitation, flood insurance coverage), the Bank may, at its option, obtain and maintain such insurance coverage as it reasonably deems necessary or appropriate, and charge Mortgagor for all sums disbursed by the Bank for such purposes.  All such sums shall be payable upon demand and shall be secured by the lien of this mortgage.

Mortgagor may obtain the insurance from an insurer of Mortgagor's choice, subject to Bank's approval.  Bank's approval will not be unreasonably withheld.  Mortgagor will pay all premiums on insurance policies, when due, directly to the insurance carrier.  All insurance policies and policy renewals shall be in form acceptable to Bank and shall include a standard mortgagee clause in favor of and in form acceptable to Bank.  Bank shall have the right to hold the policies and policy renewals subject to the terms of any Prior Mortgage.  Mortgagor will promptly furnish Bank on request with all renewal notices, or copies thereof, and all receipts of premiums paid, or copies thereof.  In the event of loss, Mortgagor will notify the insurance carrier and Bank promptly.  Bank may make proof of loss, if not made promptly by Mortgagor, subject to the terms of any Prior Mortgage.

Unless Bank otherwise agrees with Mortgagor in writing, and subject to the terms of any Prior Mortgage, insurance proceeds shall be applied to restoration or repair of the property damaged, provided that the restoration or repair is economically feasible and would not impair the security of this mortgage.  Subject to the terms of any Prior Mortgage, if restoration or repair is not economically feasible or if the security of this mortgage would be impaired, the insurance proceeds shall be applied to the sums secured by this mortgage with the excess, if any, paid to the Mortgagor.  If Mortgagor abandons the Property, or if Mortgagor fails to respond to Bank within thirty (30) days from the date Bank mails a notice to Mortgagor that the insurance carrier offers to settle a claim for insurance benefits, Mortgagor irrevocably authorizes Bank to collect and apply the insurance proceeds at Bank's option either to restoration or repair of the Property or to repayment of the sums secured by this mortgage.  Unless Bank otherwise agrees with Mortgagor in writing, any such application of proceeds to principal shall not extend or postpone the due date of any payment owing under this mortgage or the Agreement or change the amount of any such payments.  If Bank acquires the Property by foreclosure, deed in lieu of foreclosure or by any other method, all of Mortgagor's right, title and interest in and to any insurance policies and in and to the proceeds of those policies resulting from damage to the Property immediately prior to Bank's acquisition of the Property shall pass to Bank to the extent of the sums secured by this mortgage immediately prior to Bank's acquisition of the Property.

3.  PRESERVATION, MAINTENANCE OF PROPERTY; CONDOMINIUM; COOPERATIVE; PLANNED UNIT DEVELOPMENT:  Mortgagor agrees that Mortgagor will keep the Property in good repair and will not commit waste or permit impairment or deterioration of the Property.  If this mortgage is on a unit in a condominium, cooperative or a planned unit development, Mortgagor will perform all of Mortgagor's obligations under the declaration or covenants creating or governing the condominium, cooperative or planned unit development, and constituent documents.  If a condominium, cooperative or planned unit development rider is executed by Mortgagor and recorded together with this mortgage, the covenants and agreements of that rider shall be incorporated into and shall amend and supplement this mortgage as if the rider were a part hereof.

4.  PROTECTION OF SECURITY:  If Mortgagor fails to perform any of the covenants or agreements contained in this mortgage, or if any action or proceeding is commenced which materially affects Bank's interest in the Property, including, but not limited to, eminent domain,

insolvency, code enforcement, or arrangement, or proceedings involv- Mortgagor, make such appearances, disburse such sum. and take such action as is necessary to protect Bank's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs. Any amounts disbursed by Bank pursuant to this Section 4, with interest thereon, may, at Bank's option and to the extent permitted by law and to the extent consistent with the Agreement, other provisions of this mortgage and section 49-2 of the Connecticut General Statutes, become additional indebtedness secured by this mortgage. Unless Bank agrees with Mortgagor to other terms of payment, such amounts shall be payable upon notice from Bank to Mortgagor requesting payment thereof, and shall bear interest at the highest rate permissible under applicable law. Nothing contained in this Paragraph shall require Bank to incur any expense or take any action hereunder.

5.  INSPECTION: Bank may make or cause to be made reasonable entries upon and inspections of the Property, provided that Bank shall give Mortgagor notice prior to any such inspection specifying reasonable cause therefor related to its interest in the Property.

6.  CONDEMNATION: The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Bank, subject to the provisions of any Prior Mortgage.

7.  FORBEARANCE NOT A WAIVER: Any forbearance by Bank in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by Bank shall not be a waiver of its right to accelerate the maturity of the indebtedness secured by this mortgage.

8.  REMEDIES CUMULATIVE: All remedies provided in this mortgage are distinct and cumulative to any other right or remedy under this mortgage or afforded by law or equity, and may be exercised concurrently, independently or successively.

9.  SUCCESSORS AND ASSIGNS BOUND: The covenants and agreements contained in this mortgage shall bind, and the rights hereunder shall inure to, Mortgagor's and Bank's respective heirs, executors, administrators, successors and assigns, subject to the provisions of Paragraphs 13 and 14 hereof.

10.  NOTICE:

(a)  Any notice to Mortgagor provided for in this mortgage shall be given by mailing the notice, first class, postage prepaid, to Mortgagor at the Property Address or at any other address Mortgagor may designate by notice to Bank as provided in this Paragraph.

(b)  Except for notices which are required by law to be made in a different manner, any notice to Bank under this mortgage shall be mailed to Bank, first class, postage prepaid, at its address stated herein or to such other address as Bank may designate by notice to Mortgagor as provided in this Paragraph.

11.  GOVERNING LAW; SEVERABILITY: This mortgage and the Agreement shall be governed by the laws of the State of Connecticut and the United States. If any provision or clause of this mortgage or the Agreement conflicts with applicable law, such conflict shall not affect other provisions of this mortgage or the Agreement which can be given effect without the conflicting provision, and to this end the provisions of this mortgage and the Agreement are declared to be severable.

12.  ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; BANK IN POSSESSION: As additional security hereunder, and subject to any rights set forth in any Prior Mortgage, Mortgagor hereby assigns to Bank the rents of the Property, provided that Mortgagor shall, prior to an acceleration of the sums secured by this mortgage or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon an acceleration of the sums secured by this mortgage or abandonment of the Property, Bank shall, subject to the provisions of any Prior Mortgage, in person, by agent, or by judicially appointed receiver be entitled to enter upon, take possession of and manage the Property and to collect the rents from the Property, including those past due, and all rents collected by Bank or the receiver shall be applied first to payment of the costs of management from the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this mortgage. Bank and the receiver shall be liable to account only for those rents actually received.

13.  TRANSFER OF THE PROPERTY; ACCELERATION: If Mortgagor sells or transfers all or any part of the Property or an interest therein without Bank's prior written consent, excluding only:

(a)  the creation of a purchase money security interest for household appliances;

(b)  a transfer by devise, descent or by operation of law upon the death of less than all the persons signing as the Mortgagor;

(c)  the grant of any leasehold interest of three (3) years or less not containing an option to purchase; or

(d)  such other events for which the Bank is prohibited by applicable law from exercising its option to declare all amounts immediately due and payable;

Bank may, at its option, and without notice, declare all the sums secured by the mortgage to be immediately due and payable, as provided in Paragraph 14 below.

14.  ACCELERATION; REMEDIES: Without limiting the generality of the foregoing, all sums secured by this mortgage shall immediately become due and payable, at Bank's option, without necessity for demand or notice, if any Event of Default occurs under the Agreement.

All sums secured by this mortgage shall also immediately become due and payable, at Bank's option, without necessity for demand or notice, if (a) any payment required under this mortgage is not paid when due; or Mortgagor shall, unless allowed to do so by the terms of Paragraph 13 above, convey any interest in the Property or be deprived of the same by process or operation of law; or upon default in performance or any other covenant or agreement contained in this mortgage; and (b) such event constitutes an action or failure to act by Borrower(s) which adversely affects this mortgage or any right of Bank in this mortgage. If Bank declares all sums secured by this mortgage immediately due and payable pursuant to the terms hereof, Bank may invoke any remedies permitted by the Agreement, this mortgage and/or by applicable law.

15.  FUTURE ADVANCES : Bank is agreeing to make future advances to the Borrower(s) under circumstances and subject to the limitations contained in the Agreement, and such future advances, with interest thereon and together with certain fees and other charges imposed pursuant to the Agreement (sometimes herein called the "Account"), will be secured by this mortgage. Advances under the Agreement may be repaid in whole or in part from time to time by Borrower(s), and any amount repaid will, with certain limitations set forth in the Agreement, then be available for future advances up to the Credit Limit. Notwithstanding the fact that the balance of the Account may, from time to time, be equal to zero, unless and until the Account is canceled in accordance with the terms of the Agreement, the Account will remain open for future advances, and this mortgage will remain in full force and effect as security for all such future advances.

The Agreement provides for an adjustable rate feature but changes in the rate will not cause the maximum term of the Agreement to change. Changes in the interest rate and corresponding changes in the monthly payment are generally tied to a Prime Rate as published in the Wall Street

Journal, eastern edition, plus a margin s,    fied in the Agreement described also contains an element of interest. A copy of the Agreement may be obtained from the Bank for additional information on the variable rate feature.

Borrower(s) may obtain future advances by writing Special Checks issued for that purpose (hereinafter referred to as *"Special Checks"*). Advances under the Agreement are not discretionary. Bank can refuse to "honor" a properly drawn Special Check only if Bank learns of an "Event of Default" under the Agreement, or if the borrowing privileges have been canceled or suspended under the Agreement, or if the Special Check would cause the Borrower(s) to exceed the applicable Credit Limit, or if the Borrower(s) have properly and in a timely fashion stopped payment on a Special Check. Mortgagor agrees that until paid, accrued interest from prior bills may be added to the principal mortgage debt on which interest may be charged and collected. At the Final Maturity Date, Bank may agree with all applicable parties, at its sole option, to enter into a mortgage modification agreement, which would extend the term of this mortgage to allow for a payoff of the loan balance over a fixed number of years. The terms of such a mortgage modification agreement would have to be agreed to by all applicable parties to the Agreement and this mortgage at that time, and could involve a change in the form of the variable rate formula and the lifetime maximum interest rate, but in no event would it extend the term of this mortgage, as modified, beyond 30 years from the date of the Agreement. A copy of the mortgage modification agreement would be filed on the land records. This provision does not limit any other options or remedies available to Bank, and the Bank is under no obligation whatsoever to enter into such an extension.

16. RECEIPT OF COPIES AND RECEIPT OF CONSIDERATION: Each Mortgagor acknowledges receiving one separate copy of the Agreement and two copies of the notice entitled "Your Right to Cancel". If any Mortgagor is *not* also a Borrower(s) under the Agreement, that Mortgagor acknowledges that he or she is giving this mortgage in consideration of, and as an inducement to, the Bank entering into the Agreement and extending advances to the Borrower(s). The Mortgagor may cancel the right of the Bank to make future advances as provided in section 49-2 of the Connecticut General Statutes.

17. RIDERS: If the following box is checked, the rider described below shall be attached hereto, and shall be deemed to be a part of this Mortgage as if set forth herein. [ ] Rider (describe)

NOW, THEREFORE, if at maturity, or the date that payment of all amounts due under the Agreement become due and payable (i) all indebtedness due under the Agreement shall have been fully paid in accordance with its terms, (ii) all covenants and agreements contained in this mortgage shall have been performed, (iii) the right to future advances under the Agreement shall have been canceled or shall have expired in accordance with the terms of the Agreement, and (iv) Bank shall have been fully reimbursed for all sums of money which Bank may have paid or have otherwise become entitled to under this mortgage, then this mortgage is void; otherwise, it is to remain in full force and effect.

IN WITNESS WHEREOF, Mortgagor has executed this mortgage on the day of 12/12/2003.

Signed and Delivered
in the Presence of:

_Mortgagor_ Helyn J. Byrd

_Co-Mortgagor_ Charles H. Byrd III

_Mortgagor_

STATE OF CONNECTICUT
                              SS: Ansonia
COUNTY OF New Haven

Before me, the undersigned officer, personally appeared, Helyn J. Byrd  Charles H. Byrd III  shown to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and each acknowledged that he or she subscribed to the within instrument and acknowledged that he or she executed the same for the purposes therein contained, as his or her free act and deed. The foregoing instrument was acknowledged by each such person before me this 13th day of December , 2003.

IN WITNESS WHEREOF, I have hereunto set my hand.

Commissioner of the Superior Court
Notary Public

Notary Public
SUSAN L. MALLOY
My Commission Expires May 31, 2004

11:20 AM

DEC 17 2003

Received for Record    Town Clerk
By Linda L. Van Valkinburg

RECORDED FOR RECORD
DEC 17 2003
11 20 A.M.

0000053865



Commencing at a point on the Northerly side of Hill Street at the Southeasterly corner of land now or formerly of one Davis; thence Northerly two hundred and fifteen (215) feet more or less along land now or formerly of said Davis to a point on the Southerly side of a forty-five (45) foot avenue, said point being marked by a stone monument set in the ground; thence Easterly along the Southerly side of said avenue a distance of one hundred (100) feet; thence Southerly along land now or formerly of the Estate of William Doern a distance of two hundred and fifteen (215) feet more or less to the Northerly side of Hill Street; thence Westerly along the Northerly side of Hill Street a distance of one hundred (100) feet to point of commencement.

BK 515 PG 885

*Exhibit E*

Know all Persons by these Presents, That NAUGATUCK SAVINGS BANK ("Assignor"), of the City of Naugatuck in the County of New Haven and State of Connecticut, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell, transfer, assign, deliver, set-over and convey to NUTMEG FINANCIAL HOLDINGS LLC. ("Assignee"), without recourse or representation or warranty of any kind or nature, express or implied:

The mortgage loan from Charles H. Byrd III & Helyn J. Byrd to Naugatuck Savings Bank, dated December 12, 2003 and recorded in the Naugatuck Land Records, County of New Haven, State of CT in volume 0395, on Page 0466,

Including the promissory note related thereto, together with all amendments, supplements and modifications thereto (the "Note"), and all liens, financing statements, guaranties and security interests securing payment of the Mortgage Loan, including, without limitation, the Assignor's interest under the mortgage or deed of trust and any other documentation recorded in the real property records of the real property securing the Mortgage Loan is located (collectively the "Mortgage Documents"), and any other documents, agreements, or instruments relating to the Mortgage Loan and all right, title, interest, claims, demands, causes of action and judgments securing or relating to the Mortgage Loan (the "Other Collateral").

TO HAVE AND TO HOLD the Mortgage Loan, the Note, the Mortgage Documents and the Other Collateral unto Assignee, its successors and assigns, forever. Assignor shall cooperate with Assignee and shall execute such additional documentation, instruments and endorsements as reasonably deemed necessary by Assignee to give effect to this Assignment.

Dated: March 22, 2013

Signed, sealed and delivered                    NAUGATUCK SAVINGS BANK
In the presence of:

_Fiscariation_

By: _Bruce Noe_
_Mona T. McKay_                                  Name: Bruce Noe
                                                 Title: VP Senior Residential Loan Officer

STATE OF CONNECTICUT    )
                        ) ss. Naugatuck:  March 22, 2013
COUNTY OF NEW HAVEN     )

Personally appeared Bruce Noe, VP Senior Residential Loan Officer of Naugatuck Savings Bank, as aforesaid, Signer of the foregoing Instrument and acknowledged the same to be his/her free act and deed and as such VP Senior Residential Loan Officer and the free act and deed of said Banking Corporation, before me.

**MONA T. McKAY**
Notary Public                                    Commissioner of the Superior Court
My Commission Expires Oct. 31, 2016             Notary Public/
                                                My commission expires:

U:\PLES\AKI\NSB ASSIGNMENT TO NUTMEG FINANCIAL HOLDINGS LLC AND ADJOINING ATTY LETT 6/19/2012

Received for Record at Ansonia, CT
On 05/15/2013 At 10:23:36 am
_Madeline M. Bitton_

ORDER    403771

DOCKET NO: AANCV136013618S

SUPERIOR COURT

NUTMEG FINANCIAL HOLDINGS, LLC
    V.
BYRD, III, CHARLES H Et Al

JUDICIAL DISTRICT OF ANSONIA/
MILFORD
    AT MILFORD

7/7/2014

ORDER

ORDER REGARDING:
12/20/2013 120.00 MOTION FOR JUDGMENT-STRICT FORECLOSURE

The foregoing, having been heard by the Court, is hereby:

ORDER:

Notice of Judgment of Foreclosure by Sale

Property Address: 78 HULL STREET, ANSONIA, CT.

Judgment of Foreclosure by Sale is hereby entered as follows:

Debt: $279,945.12 as of 7/7/14
Attorney Fees: $4,175.00
Total: $284,120.12
Appraisal Fee: $280.00
Title Search Fee: $225.00
Fair Market Value: $329,000.00
Land: $55,000.00
Improvements: $274,000.00

The Sale Date is: Saturday, October 25, 2014
Terms of the Sale: 12:00 noon on the premises.
Deposit Amount: $32,900.00 Deposit to be paid by bank or certified check only.
Committee Appointed: JOHN SPONHEIMER, 277 WAKELEE AVENUE, P.O. BOX 151, ANSONIA,
CT 06401
Ordered in accordance with the Statewide Standing Orders(JD-CV-79) and Uniform Procedures for
Foreclosure by Sale Matters(JD-CV-81).
Independent Appraiser: SEAN L BARSKY, HILLTOP APRAISAL GROUP, 98 TREMONT STREET,
ANSONIA, CT 06401
Return of Appraisal by: Friday, October 10, 2014
Deposit not required if Plaintiff is the successful bidder. The Plaintiff may submit a bid via fax.
No fees or expenses prior to: Saturday, September 20, 2014
Sign to be posted on: Thursday, September 25, 2014
Publication in New Haven Register on: 10/12/2014, 10/19/2014 including a picture of the subject
property if available at no additional cost.
Ad to be posted on Judicial Website.

Plaintiff's Atty: BENDETT & MCHUGH PC, 160 FARMINGTON AVE., FARMINGTON, CT 06032

Copies sent Tuesday, September 02, 2014 to:
BENDETT & MCHUGH PC; CHARLES H BYRD III; HELYN J BYRD A/K/A HELYN J. FRANCO;

AANCV136013618S    7/7/2014                                          Page 1 of 2

ORDER    403771

DOCKET NO: AANCV136013618S

NUTMEG FINANCIAL HOLDINGS, LLC
  V.
BYRD, III, CHARLES H Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF ANSONIA/
MILFORD
  AT MILFORD

10/20/2014

## ORDER

ORDER REGARDING:
10/06/2014 136.00 MOTION TO OPEN JUDGMENT

The foregoing, having been heard by the Court, is hereby:

ORDER:

Notice of Judgment of Foreclosure by Sale (as opened and modified)

Property Address: 78 HULL STREET, ANSONIA, CT.

Judgment of Foreclosure by Sale is hereby entered as follows:

The Sale Date is: Saturday, January 10, 2015
Terms of the Sale: 12:00 noon on the premises.
Deposit Amount: $32,900.00 Deposit to be paid by bank or certified check only.
Committee Appointed: JOHN SPONHEIMER, 277 WAKELEE AVENUE, P.O. BOX 151, ANSONIA,
CT 06401
Ordered in accordance with the Statewide Standing Orders(JD-CV-79) and Uniform Procedures for
Foreclosure by Sale Matters(JD-CV-81).
No new appraisal is to be done.
No new title search is to be done. Title is to be run down since the date of the last title search only.
Deposit not required if Plaintiff is the successful bidder. The Plaintiff may submit a bid via fax.
No fees or expenses prior to: Saturday, December 06, 2014
Sign to be posted on: Thursday, December 11, 2014
Publication in New Haven Register on: 12/28/2014, 1/4/2015 including a picture of the subject property
if available at no additional cost.
Ad to be posted on Judicial Website.

All previous findings remain in effect.

Plaintiff's Atty: BENDETT & MCHUGH PC, 160 FARMINGTON AVE., FARMINGTON, CT 06032

Copies sent Tuesday, November 25, 2014 to:
BENDETT & MCHUGH PC; CHARLES H BYRD III; HELYN J BYRD A/K/A HELYN J. FRANCO;
JOHN SPONHEIMER, ESQ.

Judicial Notice (JDNO) was sent regarding this order.

*Exhibit B*

Docket No. AAN-CV-13-6013618 S

NUTMEG FINANCIAL HOLDINGS, LLC                    SUPERIOR COURT

               Plaintiff,                    JUDICIAL DISTRICT
                                OF ANSONIA/MILFORD
      v.                    AT MILFORD

CHARLES H. BYRD III, et al.                    January 9, 2015

               Defendants.

### CLAIM FOR STATUTORY STAY BY REASON OF BANKRUPTCY

      Defendant Charles H. Byrd, III, pursuant to Connecticut Practice Book section 14-1, respectfully notifies this Court and the other parties in this action that there is currently pending in the United States Bankruptcy Court for the District of Connecticut, New Haven Division a proceeding as more fully set forth in the accompanying affidavit attached hereto.

      The filing of the bankruptcy petition described in that affidavit operates as an automatic stay of this action by virtue of Title 11 U.S.C. Section 362.

                                **DEFENDANT**
                                **CHARLES H. BYRD, III**

                By: _____
                                Earle Giovanniello, Esq.
                                  Juris No. 408370
                                  129 Church Street
                                  Suite 810
                                  New Haven, CT 06510
                                  (203) 777-4003
                                  (203) 306-3109 (fax)

                                **His Attorney**

**ARGUMENT NOT REQUESTED/
TESTIMONY NOT REQUIRED**

Docket No. AAN-CV-13-6013618 S

NUTMEG FINANCIAL HOLDINGS, LLC       SUPERIOR COURT

             Plaintiff,          JUDICIAL DISTRICT
                        OF ANSONIA/MILFORD
      v.                      AT MILFORD

CHARLES H. BYRD III, et al.       January 9, 2015

           Defendants.

## AFFIDAVIT IN SUPPORT OF CLAIM FOR STATUTORY STAY BY REASON OF BANKRUPTCY

STATE OF CONNECTICUT)
                ) ss.:   At New Haven
COUNTY OF NEW HAVEN )

      Earle Giovanniello, being duly sworn, deposes and says:

    1.   I am over the age of eighteen and understand the meaning of an oath.

    2.   I believe that the facts, as hereafter set forth in this affidavit, are good and sufficient to establish a claim of statutory stay by reason of bankruptcy, pursuant to Connecticut Practice Book, section 14-1.

    3.   A bankruptcy petition under 11 U.S.C. Chapter 13 was filed by Defendant M~~iguel Cueva Rodriguez~~ *Charles H. Byrd, III* on January 9, 2015.

    4.   The address of the Bankruptcy Court in which that petition was filed is:

        U.S. Bankruptcy Court
        157 Church Street
        18th Floor
        New Haven, CT 06510.

*Exhibit I*

ORDER   403771

DOCKET NO: AANCV136013618S                    SUPERIOR COURT

NUTMEG FINANCIAL HOLDINGS, LLC                JUDICIAL DISTRICT OF ANSONIA/
  V.                                            MILFORD
BYRD, III, CHARLES H Et Al                       AT MILFORD

3/7/2016

ORDER

ORDER REGARDING:
02/02/2016 143.00 MOTION TO OPEN JUDGMENT

The foregoing, having been heard by the Court, is hereby:

ORDER: GRANTED

Notice of Judgment of Strict Foreclosure (as opened and modified)

Property Address: 78 HULL STREET, ANSONIA, CT

Judgment of Strict Foreclosure is hereby entered as follows:

Updated Debt: $307,050.11 as of 2/25/2016
Additional Attorney Fees: $2,250.00
Total: $309,300.11
Additional Appraisal Fee: $165.00
Updated Fair Market Value: $289,000.00
Land: $55,000.00
Improvements: $234,000.00

LAW DAY SET FOR Monday, April 04, 2016, for the owner of the equity of redemption, and
subsequent days for subsequent encumbrancers in the inverse order of their priorities.

Copies sent Wednesday, March 09, 2016 to:
DECHELLO LAW FIRM LLC; CHARLES H BYRD III; CONNECTICUT FAIR HOUSING
CENTER; EARLE GIOVANNIELLO; HELYN J BYRD A/K/A HELYN J. FRANCO; JOHN
SPONHEIMER

Judicial Notice (JDNO) was sent regarding this order.

403771
_____

Judge: JOHN W MORAN
Processed by: Kari Baum

AANCV136013618S   3/7/2016                                    Page 1 of 1

*Exhibit J*

Docket No. AAN-CV-13-6013618 S

NUTMEG FINANCIAL HOLDINGS, LLC          SUPERIOR COURT

            Plaintiff,                   JUDICIAL DISTRICT
                                         OF ANSONIA/MILFORD
      v.                                 AT MILFORD

CHARLES H. BYRD III, et al.              April 1, 2016

            Defendants.

## CLAIM FOR STATUTORY STAY BY REASON OF BANKRUPTCY

    Defendant Charles H. Byrd, III, pursuant to Connecticut Practice Book section 14-1, respectfully notifies this Court and the other parties in this action that there is currently pending in the United States Bankruptcy Court for the District of Connecticut, New Haven Division a proceeding as more fully set forth in the accompanying affidavit attached hereto.

    The filing of the bankruptcy petition described in that affidavit operates as an automatic stay of this action by virtue of Title 11 U.S.C. Section 362.

                         **DEFENDANT**
                         **CHARLES H. BYRD, III**

      By:    _____
                         Earle Giovanniello, Esq.
                         Juris No. 408370
                         129 Church Street
                         Suite 810
                         New Haven, CT 06510
                         (203) 777-4003
                         (203) 306-3109 (fax)

                         **His Attorney**

**ARGUMENT NOT REQUESTED/**
**TESTIMONY NOT REQUIRED**

Docket No. AAN-CV-13-6013618 S

NUTMEG FINANCIAL HOLDINGS, LLC          SUPERIOR COURT

          Plaintiff,          JUDICIAL DISTRICT
OF ANSONIA/MILFORD
    v.          AT MILFORD

CHARLES H. BYRD III, et al.

          Defendants.

## AFFIDAVIT IN SUPPORT OF CLAIM FOR STATUTORY STAY BY REASON OF BANKRUPTCY

STATE OF CONNECTICUT)
          ) ss.:   At New Haven
COUNTY OF NEW HAVEN )

      Earle Giovanniello, being duly sworn, deposes and says:

      1.   I am over the age of eighteen and understand the meaning of an oath.

      2.   I believe that the facts, as hereafter set forth in this affidavit, are good and sufficient to establish a claim of statutory stay by reason of bankruptcy, pursuant to Connecticut Practice Book, section 14-1.

      3.   A bankruptcy petition under 11 U.S.C. Chapter 13 was filed by Defendant Charles H. Byrd, III on April 1, 2016.

      4.   The address of the Bankruptcy Court in which that petition was filed is:

          U.S. Bankruptcy Court
          157 Church Street
          18th Floor
          New Haven, CT 06510.

5.   The name of the bankruptcy debtor is Charles H.

Byrd, III.

6.   The number of the bankruptcy case is 16-30500.

7.   Bankruptcy debtor Charles H. Byrd III is a

defendant in the above-captioned action.

Earle Giovanniello, Esq.

Subscribed and sworn to
before me this 1st day of
April, 2016.

Notary Public or
Commissioner of the Superior Court

**ANTHONY CARBONE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JAN. 31, 2020

Exhibit A

# United States Bankruptcy Court

## District of Connecticut

Filed and Entered
On Docket
March 8, 2017

In re:
    Charles H. Byrd III

                                                Debtor*

Case Number: 16−30500 amn
Chapter: 13

Nutmeg Financial Holdings, LLC
Movant(s)

v.

Charles H. Byrd, III , Debtor(s)
Molly T. Whiton, Trustee

Respondent(s)

## ORDER GRANTING RELIEF FROM AUTOMATIC STAY

    Nutmeg Financial Holdings, LLC (the "Movant"), filed a Motion for Relief from Stay (the "Motion", ECF
No. 35).  After notice and a hearing, *see* 11 U.S.C. § 102(1), and in compliance with the Court's Contested Matter
Procedure, it appearing that the relief sought in the Motion should be granted; it is hereby

    ORDERED: The automatic stay provided in 11 U.S.C. § 362(a) is modified pursuant to 11 U.S.C.§
362(d)(1) and 362(d)(2) to permit the Movant and/or their succesors and assignees, to exercise their rights, if any,
with respect to real property commonly known as 78 Hull Street, Ansonia, CT, in accordance with applicable
non−bankruptcy law; and it is further

    ORDERED: To the extent there exists a co−debtor, the automatic stay pursuant to 11 U.S.C. § 362(a) and
the fourteen (14) day stay pursuant to Fed. R. Bankr. P. 4001(a)(3) are not modified to allow the Movant to enforce
its interests in the real property against such co−debtor.

Dated: March 8, 2017

                                                BY THE COURT

                                                *Ann M. Nevins*
                                                United States Bankruptcy Judge
                                                District of Connecticut

United States Bankruptcy Court
District of Connecticut
157 Church Street, 18th Floor
New Haven, CT 06510

Tel. (203) 773−2009
VCIS* (866) 222−8029
* Voice Case Information System
http://www.ctb.uscourts.gov
Form 118 − pe

*For the purposes of this order, "Debtor" means "Debtors" where applicable.

*Exhibit C*

ORDER   403771

DOCKET NO: AANCV136013618S

SUPERIOR COURT

NUTMEG FINANCIAL HOLDINGS, LLC
  V.
BYRD, III, CHARLES H Et Al

JUDICIAL DISTRICT OF ANSONIA/
MILFORD
  AT MILFORD

4/10/2017

ORDER

ORDER REGARDING:
03/24/2017 167.00 MOTION TO OPEN JUDGMENT

The foregoing, having been heard by the Court, is hereby:

ORDER: GRANTED

Notice of Judgment of Strict Foreclosure (as opened and modified)

Property Address: 78 HULL STREET, ANSONIA, CT

Judgment of Strict Foreclosure is hereby entered as follows:

Updated Debt: $300,944.00 as of 4/10/2017
Additional Attorney Fees: $4,275.00
Total: $305,219.00
Additional Appraisal Fee: $165.00
Updated Fair Market Value: $288,000.00
Land: $55,000.00
Improvements: $233,000.00

LAW DAY SET FOR Monday, May 22, 2017, for the owner of the equity of redemption, and
subsequent days for subsequent encumbrancers in the inverse order of their priorities.

Copies sent Wednesday, April 12, 2017 to:
DECHELLO LAW FIRM LLC; CHARLES H BYRD III; CONNECTICUT FAIR HOUSING
CENTER; EARLE GIOVANNIELLO; HELYN J BYRD A/K/A HELYN J. FRANCO; JOHN
SPONHEIMER

Judicial Notice (JDNO) was sent regarding this order.

403771

Judge: JOHN W MORAN
Processed by: Kari Baum

*Exhibit M.*

Docket No. AAN-CV-13-6013618 S

NUTMEG FINANCIAL HOLDINGS, LLC

        Plaintiff,

     v.

CHARLES H. BYRD III, et al.

        Defendants.

SUPERIOR COURT

JUDICIAL DISTRICT
OF ANSONIA/MILFORD
AT MILFORD

May 19, 2017

## CLAIM FOR STATUTORY STAY BY REASON OF BANKRUPTCY

    Defendant Charles H. Byrd, III, pursuant to Connecticut Practice Book section 14-1, respectfully notifies this Court and the other parties in this action that there is currently pending in the United States Bankruptcy Court for the District of Connecticut, New Haven Division a proceeding as more fully set forth in the accompanying affidavit attached hereto.

    The filing of the bankruptcy petition described in that affidavit operates as an automatic stay of this action by virtue of Title 11 U.S.C. Section 362.

                 **DEFENDANT**
                 **CHARLES H. BYRD, III**

        By:    _____
                 Earle Giovanniello, Esq.
                 Juris No. 408370
                 129 Church Street
                 Suite 810
                 New Haven, CT 06510
                 (203) 777-4003
                 (203) 306-3109 (fax)

                 **His Attorney**

**ARGUMENT NOT REQUESTED/
TESTIMONY NOT REQUIRED**

Exhibit A

# United States Bankruptcy Court

## District of Connecticut



Filed and Entered
On Docket
November 2, 2017

In re:

Charles Harding Byrd

Debtor*

Case Number: 17−30748 amn
Chapter: 13

### ORDER GRANTING TRUSTEE'S MOTION TO DISMISS CHAPTER 13 CASE

Chapter 13 Trustee (the "Movant"), filed a Motion to Dismiss the Case pursuant to 11 U.S.C. § 1307(c) (the "Motion", ECF No. 32). After notice and a hearing, *see* 11 U.S.C. § 102(1); it is hereby

**ORDERED:** The Debtor's Chapter 13 Case is **DISMISSED** WITHOUT PREJUDICE ; and it is further

**ORDERED:** The Chapter 13 Trustee is directed to submit a Final Report and Account within (60) sixty days from the date of this Order.

Dated: November 2, 2017

BY THE COURT

Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut

United States Bankruptcy Court
District of Connecticut
157 Church Street, 18th Floor
New Haven, CT 06510

Tel. (203) 773−2009
VCIS* (866) 222−8029
* Voice Case Information System
http://www.ctb.uscourts.gov
Form 113 − es

*For the purposes of this order, "Debtor" means "Debtors" where applicable.

SUN-40809 0205-3 113 17-30748
BAE Systems
Bankruptcy Noticing Center
45479 Holiday Drive
Sterling, VA 20166-9411

004289  4289 1 AB 0.400  06473  1 6  8423-1-4663

Attorney Alana DeChello
110 Washington Avenue
North Haven, CT 06473-1723

*Exhibit — (Q*

ORDER    403771

DOCKET NO: AANCV136013618S

SUPERIOR COURT

NUTMEG FINANCIAL HOLDINGS, LLC
 V.
BYRD, III, CHARLES H Et Al

JUDICIAL DISTRICT OF ANSONIA/
MILFORD
 AT MILFORD

1/2/2018

## ORDER

ORDER REGARDING:
12/14/2017 181.00 MOTION FOR JUDGMENT-STRICT FORECLOSURE

The foregoing, having been heard by the Court, is hereby:

ORDER:

Notice of Judgment of Strict Foreclosure (as opened and modified)
Property Address: 78 HULL STREET, ANSONIA, CT

Judgment of Strict Foreclosure is hereby entered as follows:

Updated Debt: $310,517.02 as of 12/31/2017
Additional Attorney Fees: $4,275.00
Total: $314,792.02
Additional Appraisal Fee: $140.00
Updated Fair Market Value: $290,000.00
Land: $55,000.00
Improvements: $235,000.00

LAW DAY SET FOR Tuesday, February 13, 2018, for the owner of the equity of redemption, and
subsequent days for subsequent encumbrancers in the inverse order of their priorities.

Copies sent Monday, January 08, 2018 to:
DECHELLO LAW FIRM LLC; CHARLES H BYRD III; CONNECTICUT FAIR HOUSING
CENTER; EARLE GIOVANNIELLO; HELYN J BYRD A/K/A HELYN J. FRANCO; JOHN
SPONHEIMER

Judicial Notice (JDNO) was sent regarding this order.

403771

Judge: JOHN W MORAN
Processed by: John Urban

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**
====================================

IN RE:

**CHARLES HARDING BYRD,**
**Debtor***

**NUTMEG FINANCIAL HOLDINGS,**
**LLC**
**Movant**

**ROBERTA NAPOLITANO**
**, Trustee**

**CASE NO. 18-30218 (JAM)**

**CHAPTER 13**

**FEBRUARY 14, 2018**

## CERTIFICATION OF SERVICE

In accordance with the applicable provisions of the Federal Rules of Bankruptcy Procedure, 2002, and 7004, the undersigned certifies that on the **14th day of February, 2018,** the following documents were served on the debtor in possession, the U.S. Trustee and all appearing parties via the court's electronic filing system and by first class mail on the parties listed below:

1. **Motion for Relief From Stay;**
2. **Proposed Order;**
3. **Notice of Contested Matter Response Deadline**

**Notice by Court's Electronic Filing System:**
- Earle Giovanniello on behalf of debtor Charles Harding Byrd- office@eglaw1.com;
- U.S. Trustee- USTPRegion02.NH.ECF@USDOJ.GOV;
- Roberta Napolitano, Chapter 13 Trustee, 350 Fairfield Avenue, Bridgeport, CT 06601-rnapolitano@ch13rn.com, courtalerts@ch13rn.com;
- Synchrony Bank c/o PRA Receivables Management, LLC-claims@recoverycorp.com

**By Regular Mail To:** Charles Harding Byrd, Debtor, 78 Hull Street, Ansonia, CT 06401

**NUTMEG FINANCIAL HOLDINGS, LLC**

BY: _Alana Dechello_

**ALANA T. DECHELLO**
DECHELLO LAW FIRM, LLC
110 Washington Avenue
North Haven, CT 06473
Telephone: (203) 234-2225
Fax: (203) 203-6324
Federal Bar No.: ct30288
Email: ad@dechellolaw.com